| | |
|---|---|
| United States District Court<br>Eastern District of New York | 1:18-cv-07411 |
| Emoney Gibbs individually and on behalf of all others similarly situated<br><br>        Plaintiff<br><br>    - against -<br><br>Pepperidge Farm, Incorporated<br><br>        Defendant | Complaint |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Pepperidge Farm, Incorporated ("defendant") manufactures, markets, and sells frozen "Texas Toast" (the "Products"), sold to consumers by third parties from stores and online.

2. Their principal display panel representations include (i) thick slices of toasted white bread with specks of garlic and a yellowish tint, (ii) fresh garlic clove, (iii) pats of butter, (iv) "Pepperidge Farm" above a farmhouse, (v) "Texas Toast," (vi) "Made with Real Garlic, Butter & Parsley," (vii) "Ready in 5 Minutes," and (viii) "No Preservatives."



1



3. The back panel reinforces the front claims, stating "WELCOME TO THE WORLD OF TOASTY, GARLICKY, BUTTERY GOODNESS!" and "They start with thick hearty slices, then take it up a notch by adding great flavors from real ingredients like garlic, butter and parsley."



4. The information panel contains the nutrition facts and ingredients list.

5. Texas toast "is a toasted bread with butter, and often garlic, that is often made from a type of packaged bread that has been sliced at double the average thickness of most sliced breads."[1]

6. In describing Texas toast, two writers recently wrote that, "[G]enerally speaking, it's thick-cut toast, typically buttered on both sides and cooked on a griddle or flat-top until golden."[2]

7. Its origins can be plausibly traced to the Beaumont branch of the Texas restaurant chain, "The Pig Stand," founded in 1921.

---

[1] "Texas toast," in Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/w/index.php?title=Texas_toast&oldid=858988089 (last visited Dec. 28, 2018).

[2] Dana Hatic and Whitney Filloon, *What's So Texan About Texas Toast? Love for this thick-cut, buttery toasted bread extends well beyond the Lone Star State*, Eater, 21 June 2018, https://www.eater.com/2018/6/21/17468516/texas-toast-origins-recipe [Accessed 26 Dec. 2018].

3

8.  In the early 1940s, a manager ordered bread from Rainbo Bakery and requested it sliced thicker, given that the toast slices often were served with meaty barbecue dishes, which overwhelmed the thinner slices of bread.

9.  However, the slices were 3/4-inch to 1-inch slices, twice the thickness of standard bread, and couldn't fit in the toasters.

10. A line cook proposed "that they butter both sides of the bread and toast it on the oven racks. They did, and customers loved the gigantic, crispy, buttery slabs. Hailey [the manager] named it Texas toast, and a Texas tradition was born."[3]

11. The presence of copious amounts of butter in that kitchen was not by chance – in old southern-style barbecue sauce, butter was a main ingredient.

12. If vegetable oils or margarine were used instead of butter, it is unlikely Texas toast would be anything more than plain old toast, with vegetable oil spread.

13. Despite its name, Texas toast is known and appreciated beyond the Lonestar State.

14. In practically all variations, Texas toast is prepared with butter.

15. The Products' representations are misleading due to the representations with respect to butter, added colors and the promotion of "real" ingredients as a quality attribute.

I.  Butter Claims

16. The representations are misleading because despite the centrality of butter to the Products' representations, and its historic and culinary associations with Texas toast, the Products contain *2% or less* of butter and actually contain palm and soybean oils as the primary fat agent applied to the bread.

---

[3] "Great Bowls of Soup and Comforting Breads," Terry Thompson-Anderson and Sandy Wilson, *Texas on the Table: People, Places, and Recipes Celebrating the Flavors of the Lone Star State*, , University of Texas Press, 2014, p. 103.

17. When consumers eat a naturally dry food like bread, and especially toast, it is typically consumed with fats and oils, like butter or a vegetable oil-based fat to enhance texture, viscosity, palatability and to provide lubrication in the mouth.

18. No reasonable consumer expects that when they buy and consume a product which has a deep association with butter, and touts its butter bona-fides on the front and back labels, butter will be present in such a minute quantity.

19. Moreover, it is not expected that a product promoting the presence of butter will contain predominantly vegetable oils as its relevant lipid source.

20. This is because vegetable oils lack the more than 120 naturally occurring flavor compounds including methyl ketones and lactones present in butter.

21. Vegetable oils' higher melting point results in a greasy aftertaste on the palate, in contrast to butter, which melts at a normal body temperature.

22. Butter has been locked in competition with vegetable oil competitors since 1869, when a butter alternative, dubbed margarine, was invented as a lower priced option.

23. While margarine initially contained animal fats such as tallow, by the early 20th century it was comprised almost exclusively of vegetable oils.

24. This included discarded cotton seeds, soybeans, palm and coconut oil.

25. These oils are converted from liquid to solid through hydrogenation, fractionation and interesterification, in the presence of chemical and enzymatic catalysts.

26. Butter is the quintessential simple food, produced by churning the cream at the top of a cow's milk until the fat solidifies.

27. According to archaeologists, butter was discovered accidentally by nomadic herdsmen of the Neolithic-era, who attached sacks containing milk to their pack animals, which

unknowingly was transformed into butter after days of jostling on the harsh steppes.

28. The rivalry between butter and its lipid challengers in the 20th century was unlike any other, greater than any other foods which could allege to be rivals – i.e., grain vs. whole grain, natural fruit vs. fruit with artificial ingredients, organic v. non-organic (conventional).[4]

29. This was the battle of dairy vs. "vegetables," farm vs. city, natural v. artificial, pastoral v. urban, etc.

30. Upon the introduction of butter imitators, there was opposition by the dairy lobby, resulting in The Oleomargarine Act of 1886, which taxed margarine and defined butter.[5]

31. Vegetable oil-based margarine producers fortified their product with Vitamin A to better imitate butter, "between the expensive, genuine article [butter] and its cheaper surrogate [margarine] ('artificial butter', as it was dubbed) …The rivalry had a long history. Margarine, an industrial good, had mimicked the 'natural', time-honored butter ever since its invention in 1869."[6]

32. The Great Depression and World War II caused vegetable oil-based margarine consumption to increase, due to its lower cost, and the rationing and shortages of butter.

33. In the post-war decades, consumption of vegetable oil-based fats surpassed butter, because of its low price, convenience and public health guidance warning against saturated fats in butter.

34. By the mid-1970s, margarine consumption was three times that of butter.

---

[4] Margarine vs. butter: one of history's hottest rivalries?, Rivalry: TMSIDK Episode 17 – Freakonomics, Podcast, 4 June 2017, accessed 12 November 2017; J.H. Young, *"'This Greasy Counterfeit'": Butter Versus Oleomargarine in the United States Congress, 1886*, Bulletin of the History of Medicine, Fall (1979), 53.3, pp. 392-414; J. Bourdieu et al., *"That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266; Distillations Science + Culture + History, Butter vs. Margarine: one of America's most bizarre food battles, Podcast, 14 November 2017.

[5] Geoffrey P. Miller, *Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine*, Cal. Law Review 77 (1989) (describing the rise of the dairy lobby in response to margarine's introduction to the U.S.); W. T. Mickle, *Margarine Legislation*, American Journal of Agricultural Economics (Aug. 1941).

[6] J. Bourdieu et al., *"That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266.

35. Gradually, scientists reassessed the harm of saturated fat (butter) and discovered that vegetable oil-based margarines contained even more harmful trans fats, caused by hydrogenation.

36. Additionally, scientific consensus shifted from holding fat content responsible for the epidemic of health-related issues as opposed to other food components, such as sugar.

37. This reassessment of fat – the type and amount consumed in one's diet –

> coincided with the country's natural food trends: guided by nutritionists' evolving consensus, consumers became suspicious of highly processed foods full of refined grains, added sugars, and, yes, vegetable oils, all of which bore little resemblance to foods found in the natural world.[7]

38. According to the NYU Professor of Nutrition Marion Nestle,

> Margarine has become a marker for cheap, processed, artificial, unhealthy food. The irony is hilarious. Unilever went to a lot of trouble to formulate healthy margarines, but the zeitgeist has caught up with them.[8]

39. Professor Nestle was referring to the decision by Unilever – the world's largest vegetable oil margarine producer – to sell its "spreads" division.

40. Though margarine manufacturers attempted to capture consumer enthusiasm for natural and less processed foods by *adding* butter to vegetable oils, consumers saw through this tactic:

> Adding a little butter to the company's margarine wasn't going to change that perception: If people want butter, they want butter.[9]

41. Presently, consumers have turned away from vegetable oils, often wondering rhetorically how "oil" is derived from vegetables and why public health guidance got it so wrong.

42. In the place of vegetable oils and synthetically produced foods, there has been a resurgence of real foods like butter, valued in part because they are not made through harsh

---

[7] Amidst Natural Food Trends, Margarine Becomes Marginal, TrendSource, 18 October 2017, accessed 1 October 2018.
[8] Why the King of Margarine Wants Out, Justin Fox, Bloomberg, 6 April 2017, accessed 15 November 2017.
[9] *Id*.

7

chemical processes and lack artificial ingredients and preservatives.

43. Even food industry trade publications have recognized that consumers' affinity for butter is matched with an avoidance of its overly processed and artificial competitors, with Food Ingredients First noting:

> Consumers are also increasingly looking for natural products that taste good and they want to understand the ingredient list of their foods. Butter is as natural as it gets, made of just cream, or cream and salt – so butter offers food manufacturers the ability to have a clean, understandable ingredients list on their products.[10]

44. Food Business News echoed the pro-butter sentiment, reporting that:

> Butter is back as a growing number of consumers turn their backs to foods perceived as artificial, such as vegetable oil-based margarine. Fresh from the farm, and churned the same way for generations, butter's comeback may be attributed to its simplicity and its deliciousness.[11]

45. One food industry executive pointed out that "Butter consumption is up 25% in the last 10 years" and that "Butter is benefiting from consumers' desire for fresh, real and natural products," while demand for margarine and associated vegetable oils continues to fall.[12]

46. According to Mintel, the leading global market research firm, part of the reason for butter consumption now exceeding its vegetable oil rivals is because 68% of consumers recognize butter as pure, natural, simple and minimally processed.[13]

47. In contrast, no consumers could look at a palm or coconut tree and easily envision a method by which they would arrive at palm and coconut oils.

48. Butter, on the other hand, is made merely through churning the milk from a cow, a task often undertaken by schoolchildren on class trips to a local farm.

---

[10] Butter: A healthy fat or fad?, Food Ingredients First, 10 April 2018, accessed 24 June 2018.
[11] Butter innovations churning retail sales, Donna Berry, Food Business News, 14 June 2016, accessed 19 September 2018.
[12] *Id*.
[13] Mintel, *Report on Butter, Margarine and Spreads – US (Aug. 2011)*; Brenda Reau, Butter is Gaining Ground with Consumer Demand for Natural Products, Michigan State University Extension Product Center (Sep. 15, 2011).

49. The most recent Agricultural Outlook, a collaborative effort of the Organisation for Economic Co-operation and Development (OECD) and the Food and Agriculture Organization (FAO) of the United Nations, reached the same conclusion as industry insiders:

> Dairy demand in developed countries has been shifting for several years towards butter and dairy fat and away from substitutes based on vegetable oil. This trend can be attributed to a more positive health assessment of dairy fat and a change in taste.[14]

50. Consumers' strong preferences for butter or vegetable oil alternatives have also been noted by researchers and scientists.[15]

51. Food scientists who have studied the usage of butter vis-à-vis vegetable oil-based margarine confirmed the strong sentiments of consumers regarding lipid preferences, noting that "consumers appeared to fall primarily into two groups: butter-only consumers, and margarine + butter consumers," because margarine loyalists "often used butter for special occasions or for baking."[16]

52. Another study came to a similar conclusion – though vegetable oil devotees are open to butter, those who prefer butter are unlikely to use vegetable oil-based margarine.[17]

53. Consumers reasonably expect food manufacturers to make products in a way that is familiar and appealing to them, based upon their typical experiences making foods at home and

---

[14] OECD/FAO (2018), "Dairy and dairy products" (pp. 163-174) in *OECD-FAO Agricultural Outlook 2018-2027*, OECD Publishing, Paris/Food and Agriculture Organization of the United Nations, Rome. https://doi.org/10.1787/agr_outlook-2018-en

[15] Nina Martyris, *Operation Margarine: Tracing the Wartime Rise of Ersatz Butter*, Harper's Magazine – Blog (May 2, 2014) (describing the intensity of reactions brought about by replacing butter with margarine and noting "Margarine thrives on adversity, and its origins are rooted in it."); Libby Copeland, *New Book Clarifies Butter's Spread and Chronicles Its Wars With Margarine*, Smithsonian.com (Nov. 21, 2016) ("For decades there's been a huge butter versus margarine debate").

[16] A.J. Krause, *Identification of the Characteristics that Drive Consumer Liking of Butter*, Journal of Dairy Science (2007).

[17] M. Michicich, *Consumer Acceptance, Consumption and Sensory Attributes of Spreads Made from Designer Fats*, Food Quality and Preference (1999).

ingredient preferences and they have responded, reformulating products to match this demand.[18]

54. This preference towards "homemade" style foods is promoted on the Products' labels through the farm-based imagery, the intentionally faded font of "Texas Toast" and the call-out claims to the "real" ingredients.

55. This is consistent with the reports of Food Navigator, a food industry publication, which reported that "that there's actually much more consumer focus on front-of-pack claims than on the ingredient list" when it comes to matching consumer preferences, quoting the director of marketing for DuPont Nutrition & Health in North America.[19]

56. Across the food industry, companies big and small have embarked on efforts to put out products which appeal to consumers seeking foods like they would make at home.

57. Natural Products Insider described what consumers expect when purchasing a product like the Texas toast of defendant – "[A] ready-made dish that requires simple heating takes the pressure off a busy weeknight, but for an increasing number of consumers, it also must have a *homemade character*." (emphasis added).[20]

58. More significant than any difference between butter and vegetable oils over the exact number of micronutrients or grams of certain components is the desire of plaintiff and consumers to eschew synthetic foods in favor of natural and simpler ones – butter, made from cow's milk vis-à-vis vegetable oils of miscellaneous plant origins, currently made through interestification.

59. No reasonable consumer expects a product which emphasizes butter in these ways to also include vegetable oils and to include predominantly vegetable oils, since butter has long been

---

[18] Survey Says Consumers Prefer Natural, Homemade Tasting Food, Natural Products Insider, 12 September 2013
[19] Elaine Watson, Who is driving the clean label agenda, and what does clean really mean?, Food Navigator, 9 March 2012.
[20] Cindy Hazen, Addressing Texture Challenges in Clean Label Prepared Foods, Natural Products Insider, 3 July 2018,

the <u>opposite</u> of such foods.

60. To the extent reasonable consumers consume butter *and* vegetable oils, this would be done in separate foods (i.e., butter for baking muffins, margarine for preparing vegetables), instead of using a bit of each within the same food.

61. This "context of use" of the two fats is similar to how most people would prefer watching an entire movie (even a bad film) instead of seeing half of two highly regarded movies – variety is not always preferred.

62. Researchers who studied this issue confirmed this common-sense belief, citing participant's remarks on choosing butter or a vegetable oil-based alternative: "It all depends, sometimes if you are eating a plain piece of bread you would prefer something with a bit of taste but if you were having sandwiches you would use a low fat spread" and "If I was having bread buttered it would be butter" instead of vegetable oil alternatives.[21]

II. Coloring Causes Butter Claims to be Misleading

63. The Products' are represented on the front label as yellowish, with a backdrop of several pats of butter.

64. The implication is that the yellowish color of the toast was supplied by the butter, which is a familiar association made by consumers.

65. However, the ingredient list states the Products contain "annatto and turmeric extracts for color."

66. While annatto and turmeric are permitted ingredients used often for coloring

---

[21] Jennifer Hamilton et al. "Reduced fat products–consumer perceptions and preferences." *British Food Journal* 102.7 (2000): 494-506.

11

purposes, their contribution towards the coloring of the Products, in light of the emphasis on butter in the labels and the expectation that Texas toast, in general, contain significant amounts or exclusively contain butter.

67. The coloring of vegetable oil-based butter alternatives has a long and ignominious history.

68. Numerous states banned the vegetable oil-derived margarine altogether, while others outlawed their practice of coloring their product yellow to fraudulently sell it as butter.[22]

69. Because several states prohibited the sale of yellow margarine, margarine was often sold in its un-colored form with packets or beads of yellow dye that the consumer could mix into the product themselves as a way to get around the unappetizing color of the un-dyed margarine while still abiding by the regulations.[23]

70. Even a Supreme Court Justice Judge John Marshall Harlan offered thoughts on why butter's imitators copied its yellow color:

> [T]he real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk.[24]

71. Though butter *may* contain annatto for coloring, the presence of such coloring is misleading here because (i) the product emphasizes butter through its labels and from association with its name (Texas toast) and (ii) contains vegetable oils as its almost exclusive lipid source, except for the 2% or less amount of butter.

---

[22] April White, *When Margarine Was Contraband*, JSTOR Daily, 24 Aug. 2017, accessed 15 October 2017; *The Butter vs. Margarine Wars Sweep Vermont in 1900*, New England Historical Society, accessed 10 November 2017.
[23] Rebecca Rupp, *The Butter Wars: When Margarine Was Pink*, National Geographic Blog – The Plate – Serving daily discussions on food (Aug. 13, 2014); see also Ruth Dupré, *"If It's Yellow, It Must be Butter": Margarine Regulation in North America Since 1886*, Journal of Econ. History, (1999).
[24] Michael J. Pettit, *The unwary purchaser: Consumer psychology and the regulation of commerce in America*, Journal of the History of the Behavioral Sciences 43.4 (2007): 379-399.

72. The coloring makes the consumer think they are getting all or at least, mostly butter, based on the representations, and Product type, when the opposite is true.

73. The Products' claims to contain "real" garlic, butter and parsley is intended to make consumers believe that it does not contain ingredients or possess attributes which are "not real," or inauthentic.

74. However, the Products are made through the use of genetically modified organisms (GMOs), which are the antithesis of "real" or authentic, ingredients promoted on the front label.

75. This disclosure is made beneath the ingredient list, "Partially Produced With Genetic Engineering," *supra*.

76. No reasonable consumer would expect that a simple product, promoting "real" ingredients, would also contain ingredients made from "genetic engineering."

77. The source of the "genetically engineered" ingredients is likely the palm and/or soybean oil, as these are often made from GMOs.

78. Monsanto, the largest global producer of genetically modified seeds has described GMOs as "Plants or animals that have had their genetic makeup altered," whereby "genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."

79. The Environmental Protection Agency ("EPA") has distinguished conventional breeding, through cross-pollination, from genetic engineering using modern scientific techniques.

> For a plant-incorporated pesticide, one would breed a plant that produces a pesticide with a sexually compatible plant that does not possess this property but possesses other properties of interest to the breeder, e.g., sweeter fruit. Then, out of the offspring, the breeder would choose the offspring plant that produces the pesticide, and therefore expresses the desired pesticidal trait, as well as producing sweeter fruit.
>
> Genetically engineered plant-incorporated protectants are created through a

13

> process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material. For example, a desired gene that produces a desired pesticide [](e.g., the insecticidal protein Bt from the bacterium, Bacillus thuringiensis)can be isolated from another organism, such as a bacterium, and then inserted into a plant. The desired gene becomes part of the plant's DNA. The plant then expresses the incorporated gene and produces the pesticidal protein as it would one of its own components.

80. Conventional breeding entails sexual and asexual reproduction to develop new plant varieties through selection, and only seeks to achieve expression of genetic material already present within a species.

81. Genetic engineering requires insertion of unrelated genetic material, followed up by selection of the varieties to be used.

82. The use of artificial GMOs in a product where the highlighted and emphasized ingredient is the apex of natural and simple is deceptive

83. Excluding tax, the Products cost no less than $3.99, a premium price compared to other similar products.

## Jurisdiction and Venue

84. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

85. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

86. This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

87. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

88. A substantial part of events and omissions giving rise to the claims occurred in this

District.

## Class Allegations

89. The classes consist of all consumers in the following states: <u>all</u>, <u>New York</u> who purchased any Products with actionable representations during the statutes of limitation.

90. A class action is superior to other methods for fair and efficient adjudication.

91. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

92. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

93. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

94. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

95. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

96. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

97. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

98. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

## Parties

99. Plaintiff is a citizen of Queens County, New York.

100. Defendant is a Connecticut corporation with its principal place of business in Norwalk, Connecticut.

101. In 2017 and/or 2018, plaintiff purchased one or more of the Products for personal consumption, for no less than $3.99 per product, excluding tax, within this district and/or State.

102. Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

103. Plaintiff would purchase the Products again if there were assurances that the Products' representations were no longer misleading.

### New York General Business Law ("GBL") §§ 349 & 350

104. Plaintiffs incorporates by references all preceding paragraphs.

105. Defendant's representations are false, unfair, deceptive and misleading

106. Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

107. Plaintiff desired to purchase products which were as described by defendant.

108. The representations and omissions were relied on by plaintiff and class members, who paid more than they would have, causing damages.

### Negligent Misrepresentation

109. Plaintiff incorporates by references all preceding paragraphs.

110. Defendant misrepresented the composition of the Products.

111. Defendant had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

112. This duty is based, in part, on defendant's affirmative claim that the Products contained certain ingredients, with the implication that they would not contain those ingredients

that were the opposite of those ingredients.

113. Defendant negligently misrepresented and/or negligently omitted material facts.

114. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

115. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability</u>

116. Plaintiff incorporates by references all preceding paragraphs.

117. Defendant manufactures and sells Products which purport to contain ingredients and qualities, which implicitly indicates they do not contain other ingredients or attributes.

118. Defendant warranted aspects to plaintiff and class members, when this was not truthful and was misleading.

119. Defendant is one of the most established and iconic brands, the logo's farmhouse the epitome of Americana and a bygone rural way of life, and owed a special duty to represent all of the facts, instead of only those which would be viewed favorably.

120. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

121. Plaintiff and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

122. Plaintiff incorporates by references all preceding paragraphs.

123. Defendant's purpose was to mislead consumers who seek foods that contain

ingredients they are familiar with instead of highly processed components.

124. Defendant's intent was to secure economic advantage in the marketplace against competitors.

125. Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

### Unjust Enrichment

126. Plaintiff incorporates by references all preceding paragraphs.

127. Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing defendant to correct such practices to comply with the law;
3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;
4. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and
5. Such other and further relief as the Court deems just and proper.

Dated: December 27, 2018

Respectfully submitted,

 

                                                Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan (SS-8533)
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

Levin-Epstein & Associates, P.C.
Joshua Levin-Epstein
1 Penn Plaza, Suite 2527
New York, NY 10119
(212) 792-0046
joshua@levinepstein.com

1:18-cv-07411
United States District Court
Eastern District of New York

Emoney Gibbs individually and on behalf of all others similarly situated

Plaintiffs

- against -

Pepperidge Farm, Incorporated

Defendant(s)

Complaint

Sheehan & Associates, P.C.
505 Northern Blvd., #311
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  December 27, 2018

/s/ Spencer Sheehan
Spencer Sheehan